Filed 10/22/20  Law Offices of Gary Kurtz v. Markowitz CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| LAW OFFICES OF GARY KURTZ,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>PHILIP MARKOWITZ,<br><br>　　　Defendant and Appellant. | B291880<br><br>(Los Angeles County Super. Ct. No. LC103719) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rupert A. Byrdsong, Judge.  Reversed and remanded with directions.

Law Offices of Jeffrey A. Cohen and Jeffrey A. Cohen; Marcus, Watanabe & Enowitz, David M. Marcus and Daniel J. Enowitz for Defendant and Appellant.

Gabriel Law Group, Jonathan G. Gabriel, David S. Mayes; Law Offices of Gary Kurtz and Gary Kurtz for Plaintiff and Respondent.

————————————————

Philip Markowitz appeals from a judgment after a bench trial entered in favor of the Law Offices of Gary Kurtz.[1] Kurtz, who provided legal representation to Markowitz and his wholly owned company Four Star General Properties, LLC (Four Star), sued Markowitz for breach of contract over unpaid attorneys' fees. Markowitz contends the trial court erred in entering judgment for Kurtz because substantial evidence does not support the court's finding the parties entered a written engagement agreement or the court's determination of damages. Markowitz also asserts the trial court erred in failing to address his affirmative defenses in its statement of decision. He further contends the court erred in excluding from evidence an order denying sanctions in the action in which Kurtz represented him.

Substantial evidence supports the trial court's findings the parties entered into a written engagement agreement and Markowitz breached the contract. However, substantial evidence does not support the trial court's calculation of damages. The trial court also erred in failing to address in its statement of decision Markowitz's affirmative defense seeking an offset for Kurtz's asserted legal malpractice. We reverse and remand for the trial court to address Markowitz's affirmative defense of legal malpractice and to recalculate the amount of damages.

---

[1] We refer to the Law Offices of Gary Kurtz and its sole practitioner Gary A. Kurtz interchangeably as Kurtz, except where noted.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *Kurtz's Representation of Four Star and Markowitz in the* Blue Water *Action*[2]

In the early 2000's Markowitz partnered with Blue Water Sunset, LLC (Blue Water Sunset) to form three limited liability companies (the LLC's) to invest in a parking facility for freight trucks.  In June 2004 Blue Water Sunset sued Markowitz and the LLC's to dissolve the companies and distribute their assets based on allegations Markowitz misappropriated income and conveyed the LLC's assets to Four Star.[3]  (*Blue Water Sunset, LLC v. First View, LLC* (Super. Ct. L.A. County, 2014, No. BC316696) (*Blue Water* action).)  Four Star was later joined as a defendant.  The trial court in the *Blue Water* action appointed a receiver, and in October 2005 the court transferred the property owned by Four Star into the receivership.

In December 2005 Markowitz retained Kurtz to represent Four Star in the *Blue Water* action.  The parties dispute whether they executed an engagement agreement.  It is undisputed, however, the parties agreed Kurtz would charge an hourly rate of

---

[2]    The background facts are taken from the trial testimony and exhibits.  We indicate where the facts are in dispute.

[3]    On December 2, 2004 Markowitz and the LLC's filed a cross-complaint against Blue Water Sunset and its owners asserting fraud and related causes of action based on allegations Blue Water Sunset did not make its required initial capital contribution, did not place assets into the LLC's, and used the LLC's and the lawsuit to defraud Markowitz of half of the value of the capital and assets he had contributed to the LLC's.

$250, and at some point Kurtz began representing Markowitz in an individual capacity.

By the middle of 2006, Markowitz had fallen behind in paying Kurtz's invoices, and Markowitz was low on cash because Four Star's assets and income were tied up in the receivership. On September 1, 2006 Markowitz wrote in an e-mail to Kurtz, "When I saw you . . . 3 weeks ago 5K a month was acceptable to you and I wrote you a check. . . . I'm in a little bit of a bind right now and would ask I keep the same payment for now. . . . I will certainly pay all my outstanding balances in full if I have the means. [¶] . . . When the receivership is lifted I can pay you $15,000 a month probably in full as I will have an income . . . ." Kurtz responded, "[It's] not a big deal if [it's] a problem right now. [I] just don't like to see a bill grow to the point it seems very difficult to catch up."

Over the next two years Markowitz periodically paid monthly installments of $5,000 or $10,000, and the outstanding balance continued to grow as the *Blue Water* action proceeded. Kurtz accepted this arrangement because he was confident Markowitz would eventually be able to pay the balance of the legal bills because even if Markowitz lost the lawsuit, he would regain control of at least 50 percent of the assets in the receivership.

By November 2007 the balance on Kurtz's invoices exceeded $85,000, and Kurtz told Markowitz, "I need you to find some money and make a meaningful payment. [¶] . . . [¶] [T]hings are tight to the point that I cannot take my kids to [the] doctors . . . ." Markowitz responded, "[Y]eh you[']ve been pretty good about this. [¶] . . . [¶] [A]t any rate I will get you a substantial check this week ok?" A few weeks later Markowitz

wrote, "[Y]ou have it coming and if the receiver gets lifted there[']s a chance I can square you before year[']s end . . . ." Markowitz made a $15,000 payment at that time and $10,000 payments sporadically in 2008.

Beginning in June 2008 Kurtz began to charge Markowitz an hourly rate of $300, which was reflecting in his July invoice, and in October 2008 Kurtz raised the hourly rate to $350. By September 2008 the outstanding balance on Kurtz's invoices had grown to nearly $100,000. On September 9, a few months before the date then set for trial, Kurtz texted Markowitz, "[F]rom now thru trial I am going to need you to up the monthly to 25K. I will need to spend considerably more time on the case and [will not] be able to look to other regularly paying matters . . . ." Markowitz stated he was unable to pay more than $10,000 per month, and following a series of heated communications, Markowitz terminated Kurtz around September 19. Markowitz picked up his client file from Kurtz's office on or around October 27. On October 29, 2008 Kurtz substituted out as counsel for Markowitz and Four Star in the *Blue Water* action.

However, the parties shortly reconciled, and on December 11, 2008 Kurtz substituted back in as counsel for Markowitz and Four Star in the *Blue Water* action. Kurtz's January 2009 invoice stated, "As discussed, there was a credit reduction in the amount of $13,168.97 to bring the past due down to $80,000. You have paid $60,000 towards that amount. The remaining $20,000 will remain due but not payable until (1) collection from the Four Star properties (2) collection from a judgment you have or (3) the end of this action, whichever comes first. Please keep current on new charges as discussed." The

January 2009 invoice and subsequent invoices reflected an hourly rate of $350.

After several trial continuances, in late 2009 a 10-day bifurcated jury trial was held before Judge Rex Heeseman to determine whether Blue Water Sunset had made the initial capital contributions required under the LLC's operating agreements. Kurtz represented Markowitz at the trial. The jury delivered a verdict in favor of Blue Water Sunset; however, the verdict was subsequently vacated based on an affidavit of prejudice Blue Water Sunset had filed against Judge Heeseman at the beginning of the trial (but Judge Heeseman had not ruled on). Kurtz's December 2010 invoice, which included his trial work, reflected an outstanding balance exceeding $220,000.

Over the next two years Kurtz continued to represent Markowitz in the *Blue Water* action and other smaller matters, identified in his invoices as "Markowitz v. Noval," "Markowitz v. Peronne," "Markowitz v. NWA," "Markowitz v. RIT," and "Markowitz v. Four Star." Kurtz recorded his last billable work for Markowitz on October 29, 2012. By that time, the outstanding balance stated on Kurtz's invoices had grown to $329,833, and Kurtz began to bill Markowitz for interest at 10 percent per year. Over the course of the eight-year representation, Markowitz paid Kurtz $324,408.01.

On December 6, 2012 Markowitz substituted in Michael Buley to represent Markowitz and Four Star in the *Blue Water* action. A new trial on Blue Water Sunset's initial capital contributions was held as a bench trial in September 2014. At the conclusion of Blue Water Sunset's presentation of evidence, the trial court (Judge Michael Linfield) granted Markowitz's motion for entry of judgment pursuant to Code of Civil Procedure

section 631.8,[4] finding Blue Water Sunset failed to prove it made its initial capital contribution to any of the LLC's.  Judgment was entered for Markowitz on December 12, 2014.

B.     *Kurtz's Complaint and Pretrial Proceedings*

Kurtz filed this action on December 31, 2015.  The operative first amended complaint asserted four causes of action against Markowitz:  (1) breach of written contract, (2) breach of oral contract, (3) quantum meruit, and (4) common count for account stated.  Kurtz prayed for at least $437,043 in damages plus statutory interest.  The complaint attached and incorporated what it described as a "true and correct copy of the written fee agreement that was signed by both parties, which copy was on [Kurtz's] computer."  The complaint further alleged, "The original, signed version, was returned to [Markowitz] with his entire file the first time [Kurtz] withdrew from representing [Markowitz] and was never returned."

The attached engagement agreement was addressed to Markowitz, but it was undated and unsigned.  The agreement stated as to the scope of the representation, "This agreement applies to one representation, unless it is extended by a supplemental agreement in writing.  You have asked us to represent your company Four Star . . . in pending action.  This agreement will extend to other representation unless we agree, in writing, to a different arrangement."[5]  The agreement also stated,

_____

4      All further undesignated statutory references are to the Code of Civil Procedure.

5      We quote the engagement agreement, which was marked as exhibit 102 although the exhibit was not admitted.  However,

7

"My billing rate for your work will be $250.00 per hour for all time I work on your matters. My rate is subject to modification by this office with 30-days['] notice by mail." The agreement provided for reimbursement of costs incurred. It also provided, "If any [billing] statement is not paid within 15 days, the debt stated therein will accrue interest at annual rate of 10%, and we will have the right to withdraw as your lawyers."

On July 20, 2016 Kurtz filed a response to a section 454[6] demand for a bill of particulars, stating the principal balance owed to him was $335,330, plus 10 percent annual interest of $115,442 from January 3, 2013, for a total balance of $450,772 as of July 3, 2016.

On August 22, 2016 the trial court[7] sustained in part and denied in part Markowitz's demurrer to the complaint, dismissing all claims asserted by Kurtz in an individual capacity, but allowing all causes of action to proceed as asserted by Kurtz's law firm. On August 24, Markowitz answered the complaint with a general denial and asserted 20 affirmative defenses, including the fifth affirmative defense of "the doctrine of setoff and/or offset" and the sixth affirmative defense seeking an offset for Kurtz's legal malpractice.

---

Kurtz testified he and Markowitz entered into an agreement that was identical to exhibit 102, except it reflected the date it was signed.

[6]   Section 454 provides that a party "must deliver to the adverse party, within ten days after a demand thereof in writing, a copy of the account, or be precluded from giving evidence thereof."

[7]   Judge Frank J. Johnson.

8

On June 28, 2017 the trial court[8] granted Markowitz's motion for summary adjudication of Kurtz's second cause of action for breach of oral contract, but it denied summary adjudication of the remaining causes of action.

C.     *The Evidence at Trial*

A four-day bench trial was held from November 29 to December 4, 2017.  Kurtz, Markowitz, and Buley testified, as well as André Jardini, an attorney who testified as an expert for Markowitz on the reasonableness of Kurtz's legal bills and legal malpractice issues.  The trial court admitted Kurtz's invoices, Jardini's analysis of the invoices, and the parties' communications.  The court excluded the unsigned engagement agreement, but it allowed Kurtz to review the document and to testify about its preparation and contents.

1.     *Kurtz's testimony*

Markowitz was referred to Kurtz by attorney Steven Sadler.  Markowitz asked Kurtz to represent Four Star, although "later that expanded to [Kurtz] representing him in the *Blue Water* [action] as well as a number of other lawsuits."  When Kurtz was first hired, he "prepared a written [engagement] agreement for [Markowitz] that covered expressly the Four Star retention and allowed for him to expand the representation . . . ."  Kurtz agreed to work for an hourly rate of $250, a discount from his normal hourly rate of $350.  Kurtz testified he generated the engagement agreement at the time of his consultation with Markowitz, and Markowitz signed it on the same day, "about 45

_____

8     Judge Rupert A. Byrdsong ruled on Markowitz's motion for summary adjudication and presided over the remainder of the action.

minutes to an hour later." Asked how he knew it was the same day, Kurtz recalled that after meeting in his office, Markowitz, Kurtz, and Sadler went to lunch at a sushi restaurant next door and brought the agreement to review it together. After lunch, they approached Markowitz's car and "on either the hood or the roof of [the] car, [Markowitz] signed it sort of with flourish." Kurtz testified the agreement Markowitz signed differed from the unsigned agreement attached to the complaint only with respect to the date, because Kurtz printed the copy from a word processing document that was programmed to automatically update the date.

Kurtz kept the signed original of the engagement agreement in a correspondence folder in Markowitz's client file, but he believes it was lost after he returned the entire client file in 31 banker's boxes to Markowitz in October 2008 at the time of his first withdrawal as counsel. Asked by the trial judge if Kurtz made a photocopy of the executed agreement, Kurtz stated he "didn't have an opportunity to, because I was being replaced midstream in action and there was a lot going on[,] so the new lawyer needed the files before I could make those copies. . . . Every shred of paper that we could find was boxed up and given to [Markowitz]."

Kurtz testified he sent a written notice to Markowitz before he increased his hourly rate from $250 to $300, and then to $350: "I sent notice to [Markowitz]. Actually, I sent notice to all clients who were paying under 350 that I was equalizing my billing in a lock step approach. It would first increase to 300 an hour, and then it would increase to 350 an hour. And that was corroborated

10

on my bills."[9]  Kurtz testified he no longer had a copy of the rate increase letter because it too was in the client file transferred to Markowitz in October 2008.  On cross-examination, Kurtz admitted he could not produce a computer copy of the rate increase notification letter as he had been able to do with the unsigned engagement agreement.  Further, after Kurtz confirmed he was certain he sent a letter and not an e-mail to his clients, Markowitz's lawyer impeached Kurtz with deposition testimony in which Kurtz had testified, "I sent out one email that raised the rates, I think, on a graduated basis, first at $300 an hour for a period of time and then $350 an hour."

Kurtz testified the reason he resumed representation of Markowitz in December 2008 was because the parties resolved their billing dispute.[10]  He explained, "I didn't want to come back in and have any loose ends, any disputes.  So we went through carefully the complaints [Markowitz] had . . . .  He had been complaining that he felt strong-armed about the rate increase. . . .  And I think I gave him a credit for everything he was complaining about, and then with the agreement that the rate of 350 to go forward was not going to be the subject of any

---

[9]    The trial court later sustained a best evidence objection to similar testimony by Kurtz that he "sent a letter indicating that I was increasing my rate to equalize all clients in a two-step process, first to 300 and then to 350."  However, Markowitz's counsel did not object to Kurtz's initial testimony he notified Markowitz of the rate increase.  Moreover, Markowitz's counsel cross-examined Kurtz about the letter and adduced similar testimony Kurtz gave advance written notice.

[10]    Markowitz's client file was returned to Kurtz around January 2009, but Kurtz testified the engagement agreement and rate increase letter were not included in the returned files.

11

more complaints." On cross-examination, Kurtz stated he credited Markowitz $13,168.97 to offset his rate increases prior to the October 2008 withdrawal, and Markowitz agreed to pay $350 per hour from December 2008.

In October 2012 Kurtz withdrew for the second time. By that time he was owed fees and costs in the range of $325,000 to $330,000, not including interest, which Kurtz had not charged on Markowitz's balances prior to the final withdrawal.

### 2. *Markowitz's testimony*

Markowitz testified he hired Kurtz in 2005 to represent him and Four Star in the *Blue Water* action. Markowitz stated he believed "it was just for Four Star at the beginning. It may have been both. It may have changed. But . . . I own Four Star . . . ." Markowitz denied ever entering into a written engagement agreement with Kurtz. He also denied having any access to or removing any documents from his client file after Kurtz's first withdrawal, stating, "I didn't personally touch the files. They were done by a courier." Kurtz never told him any documents were missing. Markowitz further denied receiving notice by mail of an increase in Kurtz's hourly rates, stating he first learned of the higher rates from the billing statements.[11] Markowitz believed Kurtz agreed to return to his original $250 hourly rate but then raised it again within three or four months, and Markowitz felt he had no choice but to acquiesce because the trial date was approaching.

---

[11]    Asked by the trial court if Kurtz was required to provide him notice of a rate increase, Kurtz replied, "that's my understanding." Asked for the basis of that understanding, Kurtz replied, "based on the law, I think."

12

On cross-examination, Markowitz was shown an e-mail he sent to Kurtz dated October 16, 2012, in which he stated, "You have referred to the fee agreement contract I believe I signed in 2005. If I can remind you, I fired you in late 2008 . . . and hired and substituted in Miles Kavalier for a brief period. I never signed a new retainer agreement after Miles so it is kind of underhanded to talk about interest when if there was an agreement it was paid in full before rehiring you with no written agreement if you want to get technical." Asked why he had written that he believed he had signed a fee agreement contract with Kurtz in 2005, Markowitz responded, "I did think that I might have, but then I recalled that I never did sign it, that I think that [Kurtz] wanted to, but I didn't agree to all of its terms. I agreed to the 250 an hour on a $5,000 monthly rate, and that was it. . . . Let's put it this way: If I had signed it, I would think that my attorney should have a copy of it. Okay? Not a blank. That leads me to believe that I didn't sign it." Markowitz testified as to the monthly cap on fees, "[W]e spoke to each other and we agreed to have him bill me at 250 an hour, and it was a $5,000 a month cap. The paper that he put forward that I didn't sign, it's unsigned, doesn't say $5,000 a month. Yet I paid $5,000 a month. Why doesn't it say that if that's the agreement I signed."

3. *Jardini's testimony*

Jardini, an attorney, testified as an expert witness for Markowitz on the reasonableness of Kurtz's billed attorneys'

fees.[12]  Jardini based his opinion on his audit of Kurtz's legal invoices, and Jardini prepared a 68-page analysis of Kurtz's fees. Jardini determined Kurtz billed Markowitz $658,132.50 in fees and $27,168.79 in costs in connection with the *Blue Water* action between 2005 and November 2012.[13]  Jardini determined Markowitz made payments to Kurtz totaling $328,403.01.

Jardini then calculated a series of adjustments.  The largest adjustment concerned Kurtz's billing rate:  Jardini determined Kurtz's total fees would be reduced by $113,333 if Kurtz's original hourly rate of $250 applied to the entire representation.[14]  Jardini further determined $46,100 in the billed fees were based on "vague" time entries.  Jardini calculated smaller reductions for overhead that should not have been charged ($4,263), errors in billing ($1,000), and clerical work ($308).  Jardini also made deductions for hours billed in connection with an attorney disqualification motion ($13,475) and a fourth amended cross-complaint in the *Blue Star* action ($5,375), work that Markowitz contends resulted from Kurtz's negligence.  Finally, Jardini reduced Kurtz's fees by $4,081 to reflect a reduction in photocopying charges and mileage reimbursement, as well as other minor cost adjustments.  Jardini testified that after making these adjustments and accounting for

---

[12]    We discuss below Jardini's testimony about Kurtz's asserted legal malpractice.

[13]    Jardini determined Kurtz also billed Markowitz approximately $3,000 in connection with two other matters, described as "Markowitz v. Four Star" and "Markowitz v. RIT." The trial court appears to have excluded these fees from the damages award.

[14]    We have rounded the calculated amounts.

14

payments made by Markowitz, Markowitz owed Kurtz $169,958 in fees and costs.

On cross-examination, Jardini testified a $350 hourly rate for Kurtz was not unreasonable. However, Jardini testified an attorney is precluded from raising hourly rates without advance written notification to the client. Jardini opined, "[I]t would have to be a separate writing reflecting an agreement to a different rate, which I have not seen."

D.    *Statement of Decision*

Following the close of testimony, the trial court directed the parties to prepare combined closing statements and proposed statements of decision. Kurtz's 23-page proposed statement of decision asserted the trial court should find in favor of Kurtz on quantum meruit and account stated, noting "the claim for breach of written contract seeks the same damages as the claim for account stated and is, therefore, moot." Kurtz argued the court should reject Markowitz's claims for offsets based on Kurtz's alleged legal malpractice. Kurtz proposed he be awarded in quantum meruit $461,155 in fees and costs, which he calculated by multiplying the total hours billed in the *Blue Water* action (2,179.20 according to Jardini) by the "reasonable" hourly rate of $350, plus costs ($27,218), less Markowitz's payments ($328,404 according to Jardini). Kurtz also proposed the court order prejudgment interest commencing November 1, 2012, for a total of approximately $237,288, less a $3,000 credit off the principal balance. Alternatively, Kurtz proposed the court award as damages on account stated $329,458 in principal, less the $3,000 credit, plus approximately $150,000 in interest, for a total of $495,713.

15

Markowitz's 21-page proposed statement of decision asserted Kurtz failed to meet his burden to prove execution of the engagement agreement to support a cause of action for breach of written contract, and Kurtz's claim for account stated failed because his invoices did not accurately reflect payments and credits. Markowitz's proposed statement conceded Kurtz was entitled to recover the reasonable value of his services in quantum meruit "subject to defendant's pleaded defenses, including offset for damages (including malpractice) and failure to mitigate. The final amount due must account for acknowledged mistakes, all payments, made, and what is a reasonably hourly rate to which the parties agreed." Markowitz proposed the court offset his damages by $600,000 in malpractice damages. Thus, Markowitz argued, the offset exceeded Kurtz's claim, precluding any recovery.

On April 12, 2018 the trial court issued a five-page proposed statement of decision. The court recognized Kurtz and Markowitz gave contradictory testimony whether Kurtz executed the engagement agreement, but it found Markowitz's testimony was "unbelievable for several reasons," including that Markowitz was a "fairly sophisticated businessman with significant experience with legal proceedings," and Markowitz referred in his October 16, 2012 e-mail to having signed the 2005 written engagement agreement, yet denied in his testimony he ever signed it. The court found "by a preponderance of the evidence that the parties did enter into and execute a written retainer agreement."

The trial court noted that although it did not admit into evidence the unsigned copy of the engagement agreement, both parties were shown the draft and testified about it, which

16

testimony further supported the court's finding a written, executed engagement agreement existed. The court also found Kurtz's invoices corroborated his testimony he raised his hourly billing rate from $250 to $300, and then to $350 during the course of the representation. Jardini's and Buley's[15] testimony established the rate of $350 was reasonable. The court further found Markowitz had indicated he would pay his balances in full when he had the means.

The court concluded Kurtz had proven all the elements of a breach of contract. Based upon its review of the exhibits and testimony, it determined Kurtz was entitled to $658,133 in fees, based on 992 hours billed at $250 per hour, 107 hours billed at $300 per hour, and 1,080 hours billed at $350 per hour. These amounts matched the calculations by Jardini (without any offsets). The court accepted Markowitz's evidence he had made payments of $324,408 and found Kurtz incurred costs of $27,218. Accordingly the court awarded Kurtz $360,943.[16] The court noted, "By finding that plaintiff's case is a breach of contract claim, an analysis under a quantum meruit or account stated theory is unnecessary."

On April 23, 2018 Markowitz filed an objection to the proposed statement of decision including, as relevant here, that "[t]he Statement does not address [Markowitz's] defense arising

---

[15] Buley testified he charged Markowitz an hourly rate between $350 and $400 when he took over representation in the *Blue Water* action in 2012.

[16] The trial court found Kurtz agreed to waive his claim for interest on the unpaid balances based on his e-mail to Markowitz dated October 16, 2012. Kurtz objected, but the court did not modify this ruling.

17

out of [Kurtz's] professional negligence." On May 25, 2018 the trial court adopted the proposed statement of decision as its final statement of decision without modification. On July 11, 2018 the court entered judgment for Kurtz for $360,943. Markowitz timely appealed.[17]

## DISCUSSION

A.    *Standard of Review*

""""In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]' [Citation.] In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment."""" (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015)

_____

[17]    Markowitz's notice of appeal included an appeal from Judge Johnson's ruling on Markowitz's summary adjudication motion. However, Markowitz has waived this issue by failing to present any appellate argument on this issue. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 ["If a party's briefs do not provide legal argument and citation to authority on each point raised, "'the court may treat it as waived, and pass it without consideration.'""].)

239 Cal.App.4th 1088, 1102 (*Tribeca*); accord, *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 (*Sav-On Drug Stores*) ["'[Q]uestions as to the weight and sufficiency of the evidence, the construction to be put upon it, the inferences to be drawn therefrom, the credibility of witnesses . . . and the determination of [any] conflicts and inconsistencies in their testimony are matters for the trial court to resolve.'"]; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 ["'When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.'"]; *Harry Carian Sales v. Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 220 ["findings based on the credibility of witnesses will not be disturbed unless the testimony is 'incredible or inherently improbable'"].)

Moreover, "[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48 (*Fladeboe*); *Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162 [same]; see *Vasquez v. LBS Financial Credit Union* (2020) 52 Cal.App.5th 97, 109 [substantial evidence standard of review applies to express and implied findings of fact made by the superior court in its statement of decision rendered after a bench trial]; *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*) [same].)

However, "'[i]n reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.'" (*Veiseh v. Stapp* (2019) 35 Cal.App.5th 1099, 1104; accord, *Thompson, supra*, 6 Cal.App.5th at p. 981; see

19

*Feresi v. The Livery, LLC* (2014) 232 Cal.App.4th 419, 425
[questions concerning the scope of the fiduciary duties imposed by
law on partners is a legal issue subject to de novo review].)

B.      *Substantial Evidence Supports the Trial Court's Finding of
        Breach of Written Contract*

        1.      *Governing law*

        "[T]he elements of a cause of action for breach of contract
are (1) the existence of the contract, (2) plaintiff's performance or
excuse for nonperformance, (3) defendant's breach, and (4) the
resulting damages to the plaintiff." (*Oasis West Realty, LLC v.
Goldman* (2011) 51 Cal.4th 811, 821; accord, *Professional
Collection Consultants v. Lujan* (2018) 23 Cal.App.5th 685, 690.)
"'[A] contracting party's unjustified failure or refusal to perform
is a breach of contract . . . .'" (*Cates Construction, Inc. v. Talbot
Partners* (1999) 21 Cal.4th 28, 54; accord, *JRS Products, Inc. v.
Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168,
181-182.) "Where the existence of a contract is at issue and the
evidence is conflicting or admits of more than one inference, it is
for the trier of fact to determine whether the contract actually
existed." (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199,
208; accord, *Carmel Development Co., Inc. v. Anderson* (2020)
48 Cal.App.5th 492, 518.) Although interpretation of written
instrument is generally an issue of law, in cases where
"'ascertaining the intent of the parties at the time the contract
was executed depends on the credibility of extrinsic evidence,
that credibility determination and the interpretation of the
contract are questions of fact.'" (*Coyne v. De Leo* (2018)
26 Cal.App.5th 801, 822; accord, *Warner Constr. Corp. v. City of
Los Angeles* (1970) 2 Cal.3d 285, 289.)

20

2. *The trial court's finding Markowitz signed the engagement agreement is supported by substantial evidence*

Markowitz contends there was no evidence of an executed engagement agreement between the parties. However, Kurtz testified he witnessed Markowitz sign the engagement agreement "with flourish" on the hood of the latter's car after the two had lunch together to discuss the representation. The trial court found Markowitz's contrary testimony he never signed the written agreement to be unbelievable. We defer to the trial court's credibility findings. (*Sav-On Drug Stores, supra*, 34 Cal.4th at p. 334; *Tribeca, supra*, 239 Cal.App.4th at p. 1102.) Further, the court's finding Markowitz signed the agreement was supported by substantial evidence. As the court noted, Markowitz in his October 16, 2012 e-mail to Kurtz referred to "the fee agreement contract I believe I signed in 2005." When impeached with this e-mail, Markowitz's response was argumentative: "If I had signed it, I would think that my attorney should have a copy of it. Okay? Not a blank. That leads me to believe that I didn't sign it." Although Markowitz points to his testimony he never signed the agreement, we "'resolv[e] all evidentiary conflicts in favor of the prevailing party and indulg[e] all reasonable inferences to uphold the judgment.'" (*Vasquez v. LBS Financial Credit Union, supra*, 52 Cal.App.5th at p. 109; accord, *Tribeca*, at p. 1102.)

21

3.    *Substantial evidence supports an implied finding*
      *Kurtz provided written notice of his rate increases*

Markowitz contends that even if there were a written engagement letter, its terms limited Kurtz's hourly billing rate to $250, and Kurtz never gave written notice of an increase in the rate. Substantial evidence supports the trial court's finding to the contrary.

The unsigned engagement agreement stated Kurtz's billing rate would be $250 per hour "subject to modification by this office with 30days['s] notice by mail." Kurtz testified he mailed Markowitz advance written notice of his plan to raise his hourly rates in stages from $250 to $300, and then to $350. Markowitz points to the fact Kurtz was unable to produce a copy of the letter, and Kurtz testified in his deposition he had e-mailed the notification. Markowitz testified he did not receive any written notice. We infer the trial court made an implied finding Kurtz was more credible, concluding "that the invoices . . . corroborate [Kurtz's] testimony that the rate increased." (See *Fladeboe, supra*, 150 Cal.App.4th at p. 48.)

It is undisputed Markowitz received written notice of Kurtz's rate increases by virtue of the invoices he received in July and October 2008. Kurtz testified, and the January 2009 invoice corroborates, that Kurtz credited Markowitz for the hourly rate increases prior to Kurtz's resumption of representation in December 2009, but Kurtz then billed Markowitz moving forward at the $350 hourly rate. Markowitz made payments on the bills reflecting the $350 rate, for example, a $10,000 payment on February 20, 2009 and a $6,000 payment on March 19, 2009. Thus, by the time of Markowitz's payments on the invoices billed

22

at $350 per hour, Markowitz had 30 days' advance written notice of the rate increases for which he was ultimately held liable.

*Severson & Werson v. Bolinger* (1991) 235 Cal.App.3d 1569 (*Severson*), relied on by Markowitz for the proposition the invoices were not sufficient to give notice, is distinguishable.  In *Severson*, the parties' engagement agreement did not address changes in the attorney's rates, nor could the client determine from the bills he received that the agreed-upon rates had increased.  (*Id.* at p. 1573.)  The court concluded, "Under these circumstances, the fee provisions must be construed in [client's] favor as to the charges . . . ."  (*Ibid.*)  Here, Markowitz was placed on written notice through a letter (if Kurtz's testimony was believed) or Kurtz's invoices that the rates had increased.

> 4. *Markowitz has forfeited the argument he is not liable for fees incurred for representation of him in an individual capacity*

Markowitz contends Kurtz is precluded from recovering fees for his representation of Markowitz in an individual capacity because Kurtz never gave written notice he was expanding the representation beyond Four Star in the *Blue Water* action.[18] However, Markowitz has forfeited this argument by not raising it in the trial court.  (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603 ["'issues not raised in the trial court cannot be raised for the

---

[18]    Markowitz also contends Kurtz should be precluded from recovering fees for his representation of Markowitz in matters other than the *Blue Water* action.  Based on Jardini's analysis, fees invoiced to other matters totaled $3,063 plus $50 in costs, and the trial court appears to have excluded these amounts from its damages award.

first time on appeal'"]; *Hanna v. Mercedes–Benz USA, LLC* (2019) 36 Cal.App.5th 493, 513 [""'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal . . . .'"'].) ""'This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal . . . .'"" (*American Indian Health & Services Corp. v. Kent* (2018) 24 Cal.App.5th 772, 789; accord, *C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1492 ["'opposing party should not be required to defend for the first time on appeal against a new theory'"].)

Nowhere in Markowitz's trial brief, proposed statement of decision, or objection to the trial court's proposed statement of decision did Markowitz contend Kurtz could not recover for representing Markowitz in his individual capacity. Further, there is not an adequate record for our review of this issue because Jardini did not allocate Kurtz's fees between his representation of Four Star and Markowitz individually.

C.      *The Damages Award Is Not Supported by Substantial Evidence*

Markowitz contends the trial court erred in awarding Kurtz $360,943 in damages because Kurtz presented evidence his unpaid invoices totaled $329,833 and Kurtz conceded Markowitz was entitled to approximately $4,500 in credits. Kurtz counters that the trial court relied on Jardini's calculation of the total hours billed and the hourly rates charged, and "[o]ne possible reason for the discrepancy in the judgment might be that Mr. Kurtz's bills contained mathematical errors, generally in Markowitz's favor." Markowitz has the better argument.

24

In response to Markowitz's demand for a bill of particulars, Kurtz stated the principal balance owed to him was $335,330, which had the effect of limiting Kurtz's recovery on an account to the amount specified in the bill of particulars. (*Baroni v. Musick* (1934) 3 Cal.App.2d 419, 421 ["The bill of particulars must be regarded as an amplification of the complaint, and as if it had been incorporated in the amended complaint. [Citation.] Plaintiff's right to recovery was therefore limited to proof of an express contract for the payment of the fees alleged."]; see *Millet v. Bradbury* (1895) 109 Cal. 170, 172 ["[F]or the purpose of determining the plaintiff's right of recovery, or the admissibility of evidence that may be offered in support of her claim, [the bill of particulars] is to be regarded as if it had been incorporated into the complaint as originally filed."].)

The balance in the bill of particulars was consistent with Kurtz's last invoice dated November 8, 2012, which stated Markowitz's outstanding balance was $329,833. At trial Kurtz testified the invoice "shows the last work I did on the [*Blue Water* action]. And a total due as of then." Kurtz testified that at the time he withdrew, he was owed "in the 325,000, $330,000 range."

Jardini's unadjusted lodestar analysis, by contrast, does not constitute substantial evidence of Kurtz's damages on his cause of action for breach of contract. The trial court based its damages award on Jardini's calculation of the total number of hours billed and the rate at which the hours were billed. But Jardini's analysis did not take account of the credits Kurtz agreed to give Markowitz. For example, Kurtz credited Markowitz $13,168.97 as a lump sum in January 2009 to offset his rate increases in 2008. Kurtz also agreed to a $3,000 credit as payment in-kind for using Markowitz's rental property to host a

party, which Kurtz admitted was not reflected in his invoices. Kurtz also conceded in his proposed statement of decision Markowitz was entitled to a $375 credit for transferring Markowitz's client file to Buley. Markowitz is also entitled to a credit of $1,225 for fees billed in the Beyoncé Knowles litigation that Kurtz admitted was converted to a contingency agreement.

Based on the balance stated in Kurtz's November 8, 2012 invoice ($329,833) and the total undisputed credits ($4,600), the damages award should have been for $325,233, less any additional offset, as discussed below.

D. *The Trial Court Did Not Abuse Its Discretion in Excluding the Order Denying Markowitz's Motion for Costs of Proof in the* Blue Water *Action*

Markowitz also appeals from the trial court's grant of Kurtz's motion in limine to exclude from evidence an order entered by Judge Linfield in the *Blue Water* action denying Markowitz's motion for attorneys' fees as a costs-of-proof sanction for Blue Water Sunset's failure to respond to Markowitz's requests for admissions pursuant to section 2033.420, subdivision (a).[19] The court did not abuse its discretion.

---

[19] Section 2033.420, subdivision (a), provides, "If a party fails to admit . . . the truth of any matter when requested to do so under this chapter [governing requests for admission], and if the party requesting that admission thereafter proves the genuineness of . . . that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees."

26

1. *Relevant proceedings*

In April 2006, Markowitz (represented by Kurtz) served Blue Water Sunset with requests for admissions asking it to admit it had not made initial capital contributions to any of the LLC's; Blue Water Sunset failed to respond. As discussed, Markowitz prevailed in the *Blue Water* action eight years later on the basis Blue Water Sunset failed to prove it made its initial capital contributions. In March 2015 Markowitz (then represented by Buley) filed a postjudgment motion pursuant to section 2033.420, subdivision (a), seeking $520,850.08 for Kurtz's and Buley's attorneys' fees.

In a six-page minute order, Judge Linfield denied the sanctions motion on the ground Markowitz had not presented a signed proof of service showing his requests for admissions had been served on Blue Water Sunset, which denied ever receiving them. Judge Linfield's order further stated, "[E]ven if defendant could show that the requests were properly served and plaintiff had failed to respond, the motion would still be denied because the costs and fees were not reasonably incurred. . . . Normally, when [one] party fails to respond to [r]equests for [a]dmissions, the other party moves for an order deeming the [requests] admitted. Had defendant done so, the issue of whether plaintiff made the initial contribution—and perhaps this entire case— could have been resolved years ago. [Markowitz's] conduct renders the requested costs and fees unreasonable."

The trial court in this case granted Kurtz's pretrial motion in limine to exclude Judge Linfield's order from evidence. The court reasoned, "[T]here was no analysis as to whether any fees that Mr. Kurtz invoiced [Markowitz] were not reasonably incurred, were not properly incurred, [and] no typical lodestar

27

analysis as it relates to calculation of fees"; the fact the court in the *Blue Water* action denied sanctions "did not and could not negate the value or recoverability of the legal services provided to Mr. Markowitz. There's no privity. The goals are different as it relates to a retainer agreement"; and Judge Linfield's finding "the cost and fees were not reasonably incurred . . . focuses on the policy behind . . . the fee shifting nature of requests for admissions. . . . That's not the same as making a determination that the invoices that [Kurtz] submitted to Mr. Markowitz were, per se, unreasonable."

2. *The trial court did not abuse its discretion*

We review the trial court's ruling on an evidentiary motion in limine for an abuse of discretion. (*Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 269 ["As rulings on the admissibility of evidence, they are subject to review on appeal for abuse of discretion."]; cf. *Reynaud v. Technicolor Creative Services USA, Inc.* (2020) 46 Cal.App.5th 1007, 1021 ["While we generally review orders on motions in limine for abuse of discretion, our review is de novo when the issue is one of law."].) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

Markowitz contends the trial court abused its discretion because Judge Linfield's order was admissible based on issue preclusion to show Kurtz's fees incurred to prove Blue Water Sunset failed to make its initial contribution were not reasonably incurred. But as the trial court explained, whether Markowitz could recover attorneys' fees as a sanction against Blue Water Sunset for failing to respond to requests for admissions has no

28

bearing on whether Kurtz is entitled to recover fees for the work under a written engagement agreement. Further, Kurtz was not a party to litigation of the sanctions motion (or at that time in privity with Markowitz), which is necessary for issue preclusion to apply. (*Samara v. Matar* (2018) 5 Cal.5th 322, 327 [Issue preclusion applies "'(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party.'"].) Although the trial court excluded the Linfield order, it properly allowed Jardini to testify about whether Kurtz's failure to follow up on the requests for admissions to Blue Water Sunset fell below the standard of care.

E.    *The Statement of Decision Fails To Address Markowitz's Affirmative Defense He Was Entitled to an Offset for Legal Malpractice*

Markowitz contends the trial court erred in failing to address his affirmative defense of legal malpractice in its statement of decision. [20] Markowitz is correct.

1.    *Relevant background*

On appeal, Markowitz points to evidence at trial of four instances of Kurtz's alleged malpractice. First, Markowitz contends Kurtz created a conflict of interest by making a courtesy appearance on behalf of the LLC's at a case management

---

[20]    Legal malpractice may serve as an offset against an attorney's claim to recover fees pursuant to section 431.70 even after the expiration of the statute of limitations for bringing a legal malpractice claim. (*Safine v. Sinnott* (1993) 15 Cal.App.4th 614, 618-619.)

29

conference in October 2007. Blue Water Sunset brought a motion to disqualify Kurtz after the appearance because the LLC's were adverse to Markowitz as derivative defendants. The trial court denied the motion, but the Court of Appeal reversed, holding Kurtz was automatically disqualified from representing the LLC's although he could continue to represent Markowitz and Four Star. (*Blue Water Sunset, LLC v. Markowitz* (2011) 192 Cal.App.4th 477, 481, 492.) Jardini testified Kurtz's representation of Markowitz (and Four Star) and the LLC's was "a mistake" and fell below the standard of care, and Kurtz's conduct caused additional fees to be spent on the appeal. But Jardini acknowledged that at the time of the motion Markowitz had the option whether to continue to have Kurtz represent him given how expensive it would have been to start with new counsel. Jardini testified Markowitz incurred more than $52,000 in attorneys' fees defending the disqualification motion and appeal, and although Kurtz gave Markowitz a credit of $35,000, Jardini opined Kurtz owed Markowitz an additional offset of approximately $17,000. On cross-examination, Jardini conceded he may have erroneously included in his calculation some fees billed to an unrelated disqualification matter.

Second, Markowitz contends Kurtz failed timely to amend Markowitz's cross-complaint in the *Blue Water* action to include derivative claims against the LLC's to seek the return of Markowitz's asset contributions. Markowitz testified the trial court's dismissal on statute of limitations grounds of a proposed second amended cross-complaint caused Markowitz to forfeit claims worth $600,000. However, Kurtz testified he could not have earlier asserted derivative cross-claims because the LLC's had been pursuing the claims directly, and he sought to amend

30

the cross-complaint as soon as the LLC's abandoned the claims. Jardini initially testified Kurtz's failure to preserve the cross-claims fell below the standard of care, but on cross-examination Jardini admitted he had not analyzed whether the statute of limitations had expired before Kurtz could have filed derivative claims.

Third, Markowitz contends Kurtz's failure to maintain the signed proof of service of the April 2006 requests for admissions concerning Blue Water Sunset's capital contributions cost Markowitz hundreds of thousands of dollars that Markowitz could have recovered as his costs of proof in 2015, or that he might have avoided spending but for Kurtz's negligent failure to bring a motion to have the requests for admissions deemed admitted. Kurtz testified that filing a motion to deem the requests for admission admitted would have been pointless because Blue Water Sunset would simply have served a denial prior to hearing on the motion. Jardini did not provide an opinion on whether Kurtz's conduct was below the standard of care.

Fourth, Markowitz contends Kurtz was negligent in preparing a motion for leave of court to file a cross-complaint in the *Blue Water* action against opposing counsel alleging a civil conspiracy based on bribery of a witness, which was denied for insufficient evidence. Markowitz paid Kurtz $42,696 in attorneys' fees for the motion and an unsuccessful appeal. (*Four Star General Properties, LLC v. Blue Water Sunset, LLC* (Sept. 7, 2007, B190185) [nonpub. opn.].) Jardini opined the failure to obtain leave to file a claim for civil conspiracy against a lawyer would fall below the standard of care, although he did not

31

address Kurtz's conduct specifically. Further, Jardini did not calculate the amount of an offset for this work.

The parties' respective proposed statements of decision addressed the issues of malpractice and offset, but the trial court's proposed statement of decision did not discuss whether Markowitz met his burden of proving his malpractice claims. As discussed, although Markowitz objected that the proposed statement of decision did not address his affirmative defense of professional negligence, the court adopted the statement of decision without modification.

### 2.    *Governing law*

"When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . . prior to entry of judgment . . . , it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (§ 634.) The statement of decision process following a trial provides the trial court ""'an opportunity to place upon [the] record, in definite written form, its view of the facts and the law of the case, and to make the case easily reviewable on appeal by exhibiting the exact grounds upon which judgment rests. To the parties, it furnishes the means, in many instances, of having their cause reviewed without great expense." ' [Citation.] A proper statement of decision is thus essential to effective appellate review. 'Without a statement of decision, the judgment is effectively insulated from review by the substantial evidence rule,' as we would have no means of ascertaining the trial court's reasoning or determining whether its findings on disputed

32

factual issues support the judgment as a matter of law." (*Thompson, supra*, 6 Cal.App.5th at p. 982; accord, *Estate of Reed* (2017) 16 Cal.App.5th 1122, 1128.)

"The trial court is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1379-1380; *Thompson, supra*, 6 Cal.App.5th at p. 982.) "When this rule is applied, the term 'ultimate fact' generally refers to a core fact, such as an essential element of a claim. [Citation.] Ultimate facts are distinguished from evidentiary facts and from legal conclusions." (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.) "Thus, a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.'" (*Thompson,* at p. 983.) Further, "'[e]ven though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings.'" (*Ibid*.)

3.     *The trial court must amend the statement of decision to address Markowitz's four malpractice claims*

We agree with Markowitz that the trial court erred in failing to include any findings in its statement of decision on Markowitz's affirmative defense of legal malpractice. Whether Kurtz committed malpractice, and if so, the amount of any offset, were the subject of extensive testimony, pretrial and posttrial

33

briefing, and multiple motions in limine. Markowitz and Kurtz gave conflicting testimony on each of the four issues, and Jardini testified as to two of the issues that Kurtz's conduct fell below the standard of care.[21] Jardini testified Markowitz was entitled to significant offsets, the amount of which he calculated as to three of the four issues.[22] We reject Kurtz's contention we can infer from the fact the trial court did not order any offset to damages that the court made findings against Markowitz on each disputed issue. In the absence of findings on the controverted issue of legal malpractice, section 634 bars our implying findings by the

---

[21] Proof of an attorney's negligence "generally requires the testimony of experts as to the standards of care and consequences of breach." (*Lipscomb v. Krause* (1978) 87 Cal.App.3d 970, 976; see *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 985 ["W]here reasonable minds would differ on whether [attorney] met or breached the requisite standard of care, [expert] testimony was appropriately presented to the jury."].) However, "[w]here the failure of attorney performance is so clear that a trier of fact may find professional negligence unassisted by expert testimony, then expert testimony is not required." (*Wilkinson v. Rives* (1981) 116 Cal.App.3d 641, 647-648; accord, *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1093.) As discussed, Jardini did not express an opinion whether Kurtz's conduct with respect to the requests for admissions fell below the standard of care. As to Kurtz's failure to obtain leave to file a cross-complaint for conspiracy, Jardini only opined about the subject generally. Because we are remanding for the trial court to address Markowitz's two other malpractice claims on which Jardini expressed specific opinions, we remand as to all four issues.

[22] As to the failure to obtain leave to file a cross-complaint for conspiracy, Markowitz relied on the invoices setting forth the fees billed for the work.

34

trial court because we have "no means of ascertaining the trial court's reasoning or determining whether its findings on disputed factual issues support the judgment as a matter of law." (*Thompson, supra*, 6 Cal.App.5th at p. 982.) We do not know, for example, whether the trial court found Markowitz failed to prove Kurtz's conduct was negligent or failed to prove causation or damages.

Kurtz contends Markowitz's objections to the statement of decision were too general and did not provide specific citations to the record to support the objections. But Markowitz served a detailed proposed statement of decision with citations to the trial court record on each of the issues. Further, Markowitz's objection that the proposed statement of decision did not address his "defense arising out of [Kurtz's] professional negligence" provided sufficient notice to the court the statement of decision omitted a significant issue in the case.[23]

---

[23] Kurtz also argued for the first time during oral argument that Markowitz waived any challenge to the sufficiency of the statement of decision because he failed to comply with the requirement in section 632 that he request a statement of decision and "specify those controverted issues as to which the party is requesting a statement of decision." But section 632 requires a party to make a request for a statement of decision within 10 days after the court announces its tentative decision. Here, the trial court instructed the parties to prepare proposed statements of decision before the court announced its tentative decision in its April 12, 2018 proposed statement of decision. Under these unusual circumstances, it would be unreasonable to construe section 632 to require Markowitz to have requested a statement of decision setting forth the controverted issues he had already addressed in his proposed statement of decision.

35

The proper remedy for an inadequate statement of decision is to remand with directions to provide a legally sufficient statement.  (See *Gordon v. Wolfe* (1986) 179 Cal.App.3d 162, 168.)  Accordingly, we remand and direct the trial court to prepare an amended statement of decision addressing Markowitz's affirmative defense of legal malpractice limited to the following issues: (1) Kurtz's appearance in the *Blue Water* action on behalf of the LLC's at the October 2007 case management conference, (2) the unsuccessful motion to file a second amended cross-complaint, (3) the requests for admissions served on Blue Water Sunset, and (4) the unsuccessful motion for leave to file a cross-complaint against opposing counsel.

F.    *Kurtz's Failure To Register as a Law Corporation with the State Bar Does Not Void the Engagement Agreement or Relieve Markowitz from Paying Fees*[24]

Finally, Markowitz contends Kurtz is precluded from recovering attorneys' fees under the engagement agreement

---

[24]    Markowitz also argues for the first time in his reply brief that the engagement agreement is void because Kurtz failed to disclose a lapse in his malpractice insurance during the course of the representation, relying on *Hance v. Super Store Industries* (2020) 44 Cal.App.5th 676, 689.  In *Hance*, the Court of Appeal concluded the trial court abused its discretion in enforcing a fee agreement where the attorney had failed to disclose to the client he had no malpractice insurance in violation of the State Bar Rules of Professional Conduct, rule 3-410.  At trial, Kurtz testified that although he had malpractice insurance at the time of the initial engagement, he failed to inform Markowitz of a later lapse.  In response to Kurtz's motion to strike Markowitz's argument under *Hance*, Markowitz contends he did not forfeit the

because Kurtz failed to register his law practice with the State Bar of California in violation of Business and Professions Code section 6160.[25]  However, even if Kurtz failed to comply with State Bar corporate registration requirements,[26] Markowitz is not entitled to avoid his payment obligation.

---

argument because *Hance* was decided after Markowitz filed his opening brief, and Markowitz raised Kurtz's "ethical breach" as an affirmative defense.  Although Markowitz is correct *Hance* is the first published opinion to conclude a fee agreement is unenforceable where the attorney violates rule 3-410, nothing prevented Markowitz from making this argument in the trial court or in his opening brief.  The only ethical breach Markowitz raised in the trial court was the argument in his proposed statement of decision that Kurtz failed to provide written notice of his rate increases.  Because Markowitz failed to raise this argument in the trial court or in his opening brief, forfeiture applies, and we grant Kurtz's motion to strike this argument. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9, ["the claim is omitted from the opening brief and thus waived"]; *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 ["'Failure to raise specific challenges in the trial court forfeits the claim on appeal.'"].)

[25]     Business and Professions Code section 6160 states, "A law corporation is a corporation which is registered with the State Bar of California and has a currently effective certificate of registration from the State Bar pursuant to the Professional Corporation Act . . . .  Subject to all applicable statutes, rules and regulations, such law corporation is entitled to practice law."

[26]     Markowitz raised this contention in a proposed special jury instruction, prompting Kurtz to bring an oral motion in limine to exclude reference to whether Kurtz's law firm was registered. The trial court granted the motion.  Nonetheless, Kurtz was

37

*Olson v. Cohen* (2003) 106 Cal.App.4th 1209, 1218, cited by Kurtz, is directly on point. In that case, putative class plaintiffs sued an unregistered law corporation for rescission of the engagement agreement and disgorgement of fees paid over two years. (*Id.* at p. 1212.) The Court of Appeal concluded in affirming the trial court's sustaining of a demurrer, "To require disgorgement of fees because of a failure to register the corporation . . . is disproportionate to the wrong." (*Id.* at p. 1215.) The court reasoned, "Incorporation is not undertaken for the protection of clients. The protections for clients mandated by laws governing incorporation of law corporations . . . protect against abuses which might otherwise occur from the use of the corporate structure. Failure to comply with these requirements may result in an order to cease and desist or suspension or revocation of registration." (*Ibid.*) Markowitz does not cite any authority to the contrary.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court to address in an amended statement of decision Markowitz's affirmative defense of legal malpractice based on (1) Kurtz's appearance on behalf of the LLCs in the *Blue Water* litigation, (2) the motion for leave to file a second-amended cross-complaint, (3) the requests for admissions served on Blue Water Sunset, and (4) the motion for leave to file a cross-claim against opposing counsel. The court is to reduce the amount of damages

---

asked and admitted in cross-examination he did not register as a law corporation with the State Bar.

from $360,943 to $325,233, less any offset.  Each party shall bear its own costs on appeal.


FEUER, J.

We concur:


PERLUSS, P. J.


DILLON, J.[*]

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.